[No. F068818. Fifth Dist. Dec. 8, 2014.]

FRIENDS OF THE KINGS RIVER, Plaintiff and Appellant, v.
COUNTY OF FRESNO et al., Defendants and Respondents;
COLONY LAND COMPANY, L.P., et al., Real Parties in Interest and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication as to the Introduction, Facts and Procedural History, parts II and IV.E of the Discussion, and the Disposition.

106

COUNSEL

Law Offices of Donald B. Mooney, Donald B. Mooney and Marsha A. Burch for Plaintiff and Appellant.

Daniel C. Cederborg, County Counsel, and Bruce B. Johnson, Deputy County Counsel, for Defendants and Respondents.

Mitchell Chadwick, Patrick G. Mitchell and Andrew M. Skanchy for Real Parties in Interest and Respondents.

OPINION

KANE, J.—

## INTRODUCTION

This case involves the Carmelita Mine and Reclamation Project (the Project), a proposed aggregate mine and related processing plants to be operated on a 1,500-acre site at the base of the Sierra Nevada foothills near Sanger and Reedley. The Project includes, as required for every new surface mining operation, a reclamation plan that specifies how the land will be treated to provide a usable postmining site. Fresno County (County) prepared an environmental impact report (EIR) for the Project, and County's board of supervisors (the Board) certified the EIR.

An organization called Friends of the Kings River (petitioner or Friends) pursued an appeal of County's approval of the Project with the State Mining and Geology Board (the SMGB). The SMGB granted Friends's appeal and remanded the reclamation plan to County for reconsideration. County approved a revised reclamation plan, and Friends appealed to the SMGB again. In Friends's second appeal, the SMGB upheld County's decision to approve the Project.

While its first SMGB appeal was pending, Friends initiated the case before us by petitioning the trial court for writ of mandate. In its petition, Friends asserted a single cause of action alleging abuse of discretion under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).[1] The trial court denied the petition.

In this appeal, petitioner contends the trial court erred by ruling on the petition at a time when "[j]udicial review of the Project approval was not ripe" because the SMGB had granted its first appeal. Alternatively, petitioner contends County failed to proceed in a manner required by law by approving the EIR at a time when the reclamation plan was invalid.

Petitioner also raises numerous challenges to the adequacy of the EIR under CEQA. It argues the project description is inadequate, certain conclusions regarding water issues lack substantial evidence, County should have required the acquisition of agricultural conservation easements as a mitigation measure for the loss of farmland resulting from the Project, the EIR's discussion of potential impacts to air quality, hydrology and noise are inadequate, and the final EIR contains significant new information and erroneous conclusions. Finally, petitioner contends no substantial evidence supports the required findings for a conditional use permit.

We affirm the judgment.

### *FACTS AND PROCEDURAL HISTORY*

*The Project*

In June 2010, Colony Land Company, L.P. (the applicant), applied to the Fresno County Department of Public Works and Planning (the public works department) for a conditional use permit (CUP), site plan review/occupancy permit, and reclamation plan for an aggregate mine and related processing, asphalt, ready-mix concrete, and recycling plants to be operated by Carmelita

---

[1] Subsequent statutory references are to the Public Resources Code unless otherwise noted.

Resources, LLC.[2] The applicant proposed an aggregate production rate of 1.25 million tons per year and an operating life of up to 100 years.

The proposed location for the Project is a 1,500-acre site south of State Route 180, east of the Kings River, west of Reed Avenue, and approximately 15 miles east of Fresno. The Project site is on a flat terrace of former river deposits and is currently used for growing row crops and stone fruit trees. Large and small farms with grape, tree fruit, and walnut production, open pasture, and rural homesites surround the Project site. Area-wide development includes rural farming, limited commercial and municipal facilities, and residential subdivisions associated with Sanger and Reedley. In the vicinity, there are aggregate production operations to the northwest and southwest. Another mining and reclamation project has been proposed to the northeast. Reedley Airport is southeast of the Project site.

In 1986, California classified the area as a "Mineral Resource Zone 2," which means adequate information indicates that significant mineral deposits are present or there is a high likelihood for their presence. In 1988, California designated the Project site as having construction-grade aggregate deposits of regional significance.

The proposed aggregate production operation would eventually occupy 898 acres of the site. The remaining 602 acres would continue to support tree fruit production; 850 acres would be divided into 22 individual mining cells of approximately 40 acres. Each cell would be mined to a depth of 50 feet below ground surface with slopes of 2:1 (horizontal:vertical) (h:v). The average cell is estimated to contain approximately 2.69 million cubic yards of material, resulting in an approximate total of 100 million tons of marketable aggregate and 25 million tons of overburden and soils. Mining cell development would involve cell-by-cell mining and reclamation operations. According to the operational statement provided with the Project application, the operations would be typical of sand and gravel extraction, with conventional mining practices common to the industry. Soils and overburden would be removed and the underlying aggregate reserves would be excavated and transported to an onsite rock processing plant for washing and sizing. Materials would be sold as washed aggregates or used to make products including asphaltic concrete and Portland cement concrete at onsite plants. Access to the Project site would be from Reed Avenue.

The Project application included a reclamation plan intended to address the requirements of the Surface Mining and Reclamation Act of 1975 (§ 2710

---

[2] The applicant and Carmelita Resources, LLC, together are the real parties in interest in this case.

et seq.; SMARA) and associated state regulations, as well as County's reclamation standards. The reclamation plan provided that all available overburden and soils would be used to recreate agricultural soils for continued production of tree crops. Remaining areas would be covered with water at varying elevations and would be used for irrigation and potential future water storage for irrigation. It was anticipated that 25 percent of the mined areas would be reclaimed to agricultural land and the remaining mined areas would be agricultural water ponds (also referred to as pits or basins).

Subsequent revised versions of the reclamation plan were prepared in May 2012 and August 2012.

*Preparation and certification of the EIR, denial of Friends's administrative appeal*

In August 2010, County issued a notice of preparation of a draft EIR (DEIR) for the Project. In October 2011, County made the DEIR available for public review and comment. A 45-day review and comment period began on October 7 and ended on November 21, 2011.

In May 2012, County circulated the final EIR (FEIR). The FEIR consisted of the DEIR, revisions and corrections to the DEIR, comments received on the DEIR, a list of persons, organizations and public agencies that commented on the DEIR, responses to the comments, and other information added by County.[3] In July 2012, County gave notice of a public hearing on the Project. On August 9, 2012, the County planning commission held a public hearing on the Project and passed a resolution certifying the FEIR. The planning commission found that certain significant environmental effects could not be mitigated to insignificant levels and adopted a statement of overriding considerations. The significant environmental effects related to the conversion of farmland, air pollutant emissions, odors, and traffic.

Friends appealed the planning commission's approval of the Project to the Board. On October 16, 2012, the Board considered and rejected petitioner's appeal. The Board passed a resolution finding that the FEIR had been completed and processed in compliance with CEQA and certifying the FEIR. The Board adopted findings set forth in a 58-page document titled "CEQA Findings of Fact and Statement of Overriding Considerations," which was attached to the resolution, and found that the "Mitigation Monitoring and

---

[3] Because the FEIR includes all of the reports, revisions, and other information that constitute the EIR, the acronyms FEIR and EIR may be considered synonymous. Generally, we use FEIR when we are considering information added *after* the circulation of the DEIR, such as the responses to public comments and revisions to the DEIR, and we use EIR when we are discussing the document as a whole.

Reporting Program" (MMRP) (also attached to the resolution and incorporated by reference) was "adequate with respect to those mitigation measures imposed on the project."

*Friends's appeal to the SMGB*

On October 30, 2012, petitioner submitted a designation appeal[4] of the Board's decision to the SMGB, alleging that the reclamation plan was in conflict with various requirements of SMARA.

On March 14, 2013, the SMGB held a public hearing on the Project and granted petitioner's designation appeal. In a letter dated March 19, 2013, the SMGB's executive officer wrote, "[T]he SMGB granted the appeal, denied the County's approval of the reclamation plan on procedural grounds, and remanded the reclamation plan back to the County for approval consideration upon completion of the reclamation plan."[5]

*County approval of revised reclamation plan, second appeal to the SMGB*

In response to the SMGB's decision remanding the reclamation plan, the Board reconsidered the reclamation plan for the Project at a public meeting on July 9, 2013. The public works department prepared an addendum to the FEIR. County staff member Augustine Ramirez told the Board that the reclamation plan had been revised to include an engineered grading and drainage plan and a postmining water balance.[6] Ramirez stated that the revisions did "not change the information analysis or conclusions of the EIR"

---

[4] The SMGB and the parties refer to an appeal to the SMGB as a "designation appeal," and we will sometimes use the phrase as well.

[5] The appellate record also includes a staff report to the SMGB on the appeal. The report offered three suggested findings: (1) County did not have available water balance analysis or slope stability analysis to address the potential instability of the proposed 2:1 slopes of the proposed water basins at the time County approved the reclamation plan and CUP; (2) the Office of Mine Reclamation (OMR) previously informed County that the reclamation plan would not be deemed complete until three conditions were adequately addressed, County agreed to address the three conditions in the reclamation plan, but it later approved the reclamation plan without incorporating responses to the OMR-suggested conditions into the plan; and (3) "Due to uncertainties associated with the water balance calculations and related slope stability issues, as well as whether the proposed mined lands can be reclaimed to a useable [*sic*] condition which is readily adaptable for alternative land uses pursuant to . . . Section 2712[, subdivision ](a), and because the County may address those issues upon remand to allow it to complete its determination of the reclamation plan at issue, it is apparent that such remand is appropriate." These findings were not included in the SMGB's letter of March 19, 2013, and nothing in the appellate record indicates whether these findings were adopted by the SMGB.

[6] The revised reclamation plan and addendum to the FEIR are not in the administrative record and are not part of the record on appeal.

that the Board already certified, and he recommended the Board approve the revised reclamation plan. On August 6, 2013, the Board passed a resolution in which it found that the revised reclamation plan "provides for a post-mining usable condition of the site, in compliance with SMARA" and approved the addendum to the FEIR and revised reclamation plan for the Project.

On August 9, 2013, Friends submitted a second designation appeal to the SMGB, appealing the Board's approval of the revised reclamation plan. On November 14, 2013, the SMGB held a public hearing on Friends's second appeal. The SMGB determined that County's decision was supported by substantial evidence and upheld County's decision to approve a permit and reclamation plan for the Project.

*Current writ petition*

On November 20, 2012, while its first SMGB designation appeal was pending, Friends filed a petition for writ of mandate against County and the Board (respondents) challenging the certification of the EIR. Petitioner alleged that the EIR "fails to adequately disclose, analyze and/or mitigate the Project's environmental impacts as required by law" and "its conclusions regarding the Project's environmental impacts are not supported by substantial evidence." Petitioner alleged respondents violated CEQA by approving the Project because it conflicts with County's general plan.

Petitioner further alleged that the reclamation plan for the Project did not meet the requirements of SMARA and that it had submitted a designation appeal to the SMGB. Petitioner further alleged it "will amend this Petition to include allegations of SMARA violation in the event the appeal is denied."

After the SMGB granted its first designation appeal, Friends argued to the trial court that the SMGB's decision invalidated the reclamation plan for the Project and as a result, "there is no valid Project approval to be considered by this Court." Respondents and the real parties in interest took the position that the SMGB's decision was irrelevant to the issue whether County abused its discretion in certifying the EIR.[7]

---

[7] The trial court was kept informed of the progress of the designation appeals. In April 2013, Friends filed a request for judicial notice, asking the trial court to take judicial notice of documents related to the SMGB's decision in its first designation appeal. Although respondents and the real parties in interest opposed this request, after the Board approved the revised reclamation plan in August 2013, they joined petitioner's request that the trial court take judicial notice of the Board's resolution and meeting transcript. Petitioner later informed the court that it was filing a second SMGB appeal. Subsequently, the parties filed another joint request for judicial notice after the SMGB upheld the County's approval of the revised reclamation plan.

On August 23, 2013, the trial court held a hearing on the petition and took the matter under submission. The record on appeal does not include a transcript of the hearing. On November 14, 2013, the trial court issued an order denying the petition for writ of mandate.

Friends filed a notice of appeal on January 10, 2014.

*Subsequent writ petition*

On August 21, 2013, Friends filed a second petition for writ of mandate against respondents, in which it challenged the Board's decision of August 8, 2013, approving the revised reclamation plan for the Project.

## DISCUSSION

I. *The trial court did not err by ruling on the writ petition**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The successful SMGB appeal did not set aside County's approval of the reclamation plan or nullify the certification of the EIR*

A. *Statutory framework of SMARA*

"SMARA was enacted by the Legislature in recognition that 'the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety.' (§ 2711, subd. (a).)" (*Mineral Associations Coalition v. State Mining & Geology Bd.* (2006) 138 Cal.App.4th 574, 580 [41 Cal.Rptr.3d 544].)

■ "A reclamation plan under SMARA is a written plan specifying how mined land will be treated so as to minimize the environmental impacts of mining and render a mined site usable in the future for alternative purposes. (See § 2733.) Financial assurances are a mine operator's pledges of funds sufficient to perform reclamation in accordance with an approved reclamation plan. (§ 2773.1, subd. (a)(1)." (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 981 [32 Cal.Rptr.3d 109, 116 P.3d 567] (*El Dorado County*).) " 'At the heart of SMARA is the requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).)' " (*Id.* at p. 984.)

---

*See footnote, *ante,* page 105.

██ SMARA provides for " ' "home rule," ' " with the local lead agency (in this case, County) having primary responsibility for enforcing the law's requirements. (*El Dorado County, supra*, 36 Cal.4th at p. 984; see §§ 2728, 2774.1, subd. (f).) " 'Prior to approving reclamation plans and financial assurances, the lead agency submits the proposals and all supporting documentation, including information from any document prepared, adopted or certified pursuant to CEQA, to the Director [of the Department of Conservation] for review. (§ 2774, subd. (c).) The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.' " (*El Dorado County, supra*, at pp. 984–985.)

██ The SMGB is authorized to hear appeals by "any person who is aggrieved by the granting of a permit to conduct surface mining operations in an area of statewide or regional significance." (§ 2775, subd. (a).) In deciding a designation appeal, the SMGB "shall not exercise its independent judgment on the evidence but shall only determine whether the decision of the lead agency is supported by substantial evidence in the light of the whole record." (*Id.*, subd. (c).) If the SMGB determines that a lead agency's decision is not supported by substantial evidence, the SMGB "shall remand the appeal to the lead agency and the lead agency shall schedule a public hearing to reconsider its action." (*Ibid.*)

In addition, the SMGB has authority to step in and take over as the lead agency if it finds that the local lead agency has failed to meet its enforcement obligations under SMARA. (*El Dorado County, supra*, 36 Cal.4th at pp. 985–986; § 2774.4.)[10]

B. *Analysis*

The SMGB wrote that it "granted [petitioner's] appeal, denied the County's approval of the reclamation plan on procedural grounds, and remanded the

---

[10] " 'Where the lead agency fails to fulfill its duties under SMARA, the [SMGB] may take over the powers of a lead agency, except for permitting authority. The [SMGB] may step in if it finds that a lead agency has: (1) approved reclamation plans and financial assurances that are not consistent with SMARA; (2) failed to inspect mines as required by SMARA; (3) failed to seek forfeiture of financial assurances to carry out reclamation; (4) failed to take appropriate enforcement actions; (5) intentionally misrepresented the results of inspections; or (6) failed to submit the required information to the Department [of Conservation]. (§ 2774, subd. (a).)' " (*El Dorado County, supra*, 36 Cal.4th at p. 985.)

reclamation plan back to the County for approval consideration upon completion of the reclamation plan." The SMGB did not make a determination that the reclamation plan for the Project was not supported by substantial evidence but found that it was not complete for SMARA purposes.

Respondents and real parties in interest argue that a remand by the SMGB "has no impact on the validity of an approved reclamation plan, but merely informs the lead agency about the SMGB's position and requires the lead agency to consider the plan again in light of the SMGB's concerns." For the reasons explained below, we agree.

■ "[A]dministrative agencies have only such powers as have been conferred on them, expressly or by implication, by constitution or statute." (*Ferdig v. State Personnel Bd.* (1969) 71 Cal.2d 96, 103 [77 Cal.Rptr. 224, 453 P.2d 728].) " '[A]n agency literally has *no power to act* . . . unless and until [the Legislature] confers power upon it.' [Citation.]" (*Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 419 [71 Cal.Rptr.3d 522].) "That an agency has been granted *some* authority to act within a given area does not mean that it enjoys *plenary* authority to act in that area." (*Ibid.*)

■ In this case, the agency at issue, the SMGB, has not been granted authority to set aside or nullify a lead agency's approval of a project or a reclamation plan. The only remedy available for a successful appeal to the SMGB is remand to the lead agency for reconsideration. (§ 2775, subd. (c).) When the SMGB determines that a lead agency's decision is not supported by substantial evidence, the lead agency must hold a public hearing and reconsider its action, but section 2775 does not require the lead agency to set aside its prior decision. Although the SMGB wrote that it "denied the County's approval of the reclamation plan," the SMGB had no power to deny the approval of the reclamation plan. It is the local lead agency that is responsible for approving reclamation plans. (§ 2728.) This does not mean the SMGB is powerless to enforce SMARA. As we have described, the SMGB may step in and take over as the lead agency if it finds the local lead agency is not enforcing SMARA adequately.[11] (*El Dorado County, supra,* 36 Cal.4th at pp. 985–986.) That has not happened in this case, however, and County is the lead agency for SMARA and CEQA purposes. (§§ 2728, 21067; see *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 268–269 [118 Cal.Rptr.3d 736] [county in which proposed surface mining operation was located was lead agency under SMARA and CEQA].)

---

[11] In addition, where a local lead agency approves an allegedly inadequate reclamation plan, the Director of the Department of Conservation may petition for writ of mandate to seek judicial review of the local lead agency's approval of the plan. (*El Dorado County, supra,* 36 Cal.4th at pp. 992–994.)

In support of its assertion that the SMGB's remand rendered the reclamation plan "set aside" and "of no effect," petitioner cites *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 [91 Cal.Rptr.2d 66] (*County of Amador*). Petitioner's reliance on *County of Amador* is misplaced.

■ In *County of Amador*, a water agency and an irrigation district certified an EIR for a water project. After the trial court issued a writ of mandate setting aside the approval of the EIR, the agencies appealed, arguing that subsequent action by the State Water Resources Control Board (SWRCB) mooted the trial court's concerns. (*County of Amador, supra,* 76 Cal.App.4th at pp. 940–941.) The trial court had ruled that the EIR did not adequately assess the project's impacts on fishery resources and lake levels. On appeal, the agencies asserted the SWRCB later provided the requisite analysis and mitigation measures by imposing conditions in its own decision, No. 1635 (D-1635). The SWRCB, however, subsequently ordered reconsideration of D-1635. The Court of Appeal rejected the agencies' claim that D-1635 could be relied upon to remedy deficiencies in the EIR. In doing so, the court observed, "Because reconsideration has been granted, D-1635 is of no effect. It therefore cannot be deemed to 'moot' anything." (*County of Amador, supra,* at p. 949.) *County of Amador* does not support the proposition that the SMGB's remand had the effect of setting aside the reclamation plan or nullifying County's certification of the EIR in this case. *County of Amador* did not concern the issue whether the SMGB has the authority to set aside another agency's approval decision, and a case is not authority for points not decided or considered. (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155 [59 Cal.Rptr.3d 157, 158 P.3d 731].) Furthermore, the agency in *County of Amador*, the SWRCB, was reconsidering *its own decision* and it had the authority to reverse itself. (See Wat. Code, § 1123.) Here, in contrast, the SMGB reviewed and remanded County's decision, and as we have discussed, the SMGB has no statutory authority to set aside a local lead agency's approval of a reclamation plan.

■ In summary, the SMGB did not have authority to set aside County's approval of the reclamation plan for the Project. As a consequence, its decision granting Friends's first designation appeal had no effect on County's certification of the EIR and approval of the Project.

This means that Friends's arguments premised on the theory that the SMGB set aside or invalidated County's approval of the reclamation plan are also unavailing. Petitioner contends County failed to proceed in a manner required by law because it failed to comply with a County ordinance that requires there be a reclamation plan in order to approve a CUP application for a surface mining operation. Petitioner asserts: "The CUP approval was no longer valid as a result of the SMGB remand of the Reclamation Plan

because the necessary findings could not be made at the time of Project approval. At the time the trial court reviewed the 'Project' and its associated EIR, there was no valid Reclamation Plan in place." Because the SMGB did not set aside or invalidate the reclamation plan approved by County, this argument fails.

■ Having concluded that the SMGB's first designation appeal decision did not render Friends's petition unripe or moot and did not invalidate County's approval of the reclamation plan, we agree with respondents and real parties in interest that evidence of the SMGB proceedings—which occurred after County certified the EIR—is not admissible in our consideration of CEQA issues. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268] ["extra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions on the ground that the agency 'has not proceeded in a manner required by law' within the meaning of . . . section 21168.5"].)

III.  *Friends's may not raise a SMARA claim for the first time on appeal*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.  *Friends's challenges to the Project under CEQA*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

  A.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

  E.  *Mitigation for loss of farmland*

The EIR determines that the Project will result in the permanent loss of almost 600 acres of farmland and concludes that this is a significant impact. Petitioner asserts County failed to require mitigation for the conversion of farmland to other uses in violation of CEQA. We begin with a brief discussion of the law on mitigation.

  1.  *CEQA's mitigation requirement*

■ In section 21002, part of CEQA, the Legislature declared, "[I]t is the policy of the state that public agencies should not approve projects as

---

[*] See footnote, *ante*, page 105.

proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." Section 21002 has been described as a "substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (*Mountain Lion*).) This substantive mandate "is effectuated in section 21081." (*Ibid.*)

"Under [section 21081], a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures. [Citations.] The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.] Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion, supra*, 16 Cal.4th at p. 134.)[19]

An EIR must describe "feasible measures which could minimize significant adverse impacts." (CEQA Guidelines,[20] Cal. Code Regs., tit 14, § 15126.4, subd. (a)(1).) "Where several measures are available to mitigate an impact,

---

[19] Section 21081 provides:

"Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

"(a) The public agency makes one or more of the following findings with respect to each significant effect:

"(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.

"(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.

"(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

[20] "Guidelines" and "CEQA Guidelines" refer to CEQA regulations codified at title 14 California Code of Regulations section 15000 et seq. We cite these regulations as Guidelines.

" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.)

each should be discussed and the basis for selecting a particular measure should be identified." (Guidelines, § 15126.4, subd. (a)(1)(B).)

" 'Mitigation' " includes: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." (Guidelines, § 15370.) " 'Feasible' " means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

### 2. Background

Section 4.2 of the DEIR addresses potential impacts of the Project on agricultural and forestry resources. The DEIR explains that a maximum of 583 acres of farmland would be permanently lost from agricultural production as a result of the Project. This would occur over the course of 100 years at an estimated rate of five to 24 acres lost per year.

The DEIR states that it is not possible to reclaim the entire site to agricultural land due to the existing water table. It continues:

"Fresno County does not have an established farmland protection program or uniform agricultural conservation banking program to which the Applicant could contribute. However, the Applicant does have large agricultural land holdings on which agricultural easements could be placed. Securing these parcels in an agricultural easement would not reduce the number of acres lost to agricultural production, nor would it increase the number of acres under Williamson Act contract.

"Given the lack of feasible mitigation, the conversion of prime farmland, unique farmland, farmland of statewide importance, and farmland of local importance is a significant and unavoidable impact."

Three mitigation measures are recommended. Mitigation measure AG-1 provides that the current agricultural use of the Project site would continue until the land is prepared for mining activities. Mitigation measure AG-2 requires the applicant to ensure that 602 acres within the Project site but

outside the surface disturbance boundary are maintained as an agricultural buffer zone for the life of the CUP, which is estimated to be 100 years. Mitigation measure AG-3 requires the applicant to reclaim mine cells to farmland as adequate materials are generated to fill the empty mine cells.

The DEIR concludes that, after the implementation of the recommended mitigation measures, "the conversion of farmland to another land use remains a significant and unavoidable impact."

County received several public comments to the DEIR about the loss of farmland caused by the Project, and "Collective Response 6" of the FEIR addresses this concern. Some commenters suggested that the Project should mitigate the loss of farmland by establishing permanent agricultural conservation easements (ACEs) at a ratio of between one and two acres of preservation for each acre of farmland lost. A few commenters referred to a draft County policy called "Farmland Mitigation Program for Fresno County's Sanger River [B]ottom [Mineral Resource Zone] Area Due to Gravel Mining."[21]

Collective Response 6 explains, "The County's decision makers have not formally considered nor approved, nor has County staff recommended, adoption of a farmland mitigation program." The response continues:

"Approximately 35 acres (6 percent) of the Project disturbance area are Prime Farmland [citation], all of which would be replaced by mine reclamation backfill to create Prime Farmland of equal acreage [citations]. As stated in the Project objectives, one reason the Project Site is proposed as a mining site is because of the rocky soils [citation]. Reclamation would involve backfill of approximately 240 acres to surfaces that would again be capable of supporting tree crops. Removal of cobbles and gravels from the soils before soils are replaced would remove one of the primary limitations of the site soils in their present condition. . . . Production records indicate that the existing site soils produce 20 percent less fruit on average than the same trees on soils without the cobbles. Therefore, the reclaimed soils are expected to be 20 percent more productive per acre than under existing conditions. The reclaimed lands would be returned to agricultural lands of equal or better quality of that currently existing on the site. In addition, . . . Mitigation Measure AG-1 require[s] phasing of the Project's mining activities to ensure that areas to be mined remain in agricultural production as long as practicable.

"Mitigation Measure AG-2 requires that the Applicant ensure that 602 acres of farmland within the Project Site, but outside of the Project's mining

---

[21] None of the parties offers a record citation for this draft policy, and we have not located it in the record.

disturbance area boundary, be maintained as an agricultural buffer zone and remain in agricultural production for the life of the [CUP], estimated at 100 years. This mitigation measure therefore requires preservation of farmland at a 1:1 ratio during the life of the Project. While this preservation requirement is not in perpetuity, as would occur under a conservation easement, implementing this mitigation measure would mitigate the temporal loss of agricultural land during the life of the Project. In addition, no settled statutory or published CEQA case law exists that mandates mitigating loss of farmland using conservation easements [citations].

"Mitigation Measure AG-3 would accelerate the return to farmland of certain mined areas, and the Reclamation Plan requires that approximately 240 acres of the Project be reclaimed to agricultural use as soon as possible.

"However, even with implementation of the mitigation identified in the Draft EIR, the County considers the permanent loss of up to 583 acres of farmland to represent a significant impact under CEQA. Permanent preservation through a farmland conservation easement would not reduce the amount of farmland permanently converted as result of the Project. A conservation easement would not 'replace or provide a substitute resource' (CEQA Guidelines § 15370[, subd. ](e)) for the permanent loss of 583 acres of farmland, which is unique and would be lost permanently. Accordingly, a conservation easement would not mitigate the impact to a less-than-significant level or substantially reduce the severity of the impact, as would Mitigation Measures AG 1–3."

### 3. *Analysis*

Petitioner initially contends County violated CEQA by failing to require mitigation for the conversion of farmland to other uses. It asserts, "The EIR for the Project, however, does not include any specific measures to mitigate the adverse environmental impact of eliminating important farmland." This is not correct. The EIR recommends three mitigation measures, which the County approved. Pursuant to the MMRP, the public works department is responsible for enforcement of the mitigation measures, and compliance is to be monitored in yearly mine inspections. Mitigation measure AG-2, for example, requires the applicant to maintain 602 acres in agricultural production for the life of the CUP. Thus, the EIR does include specific measures to mitigate the loss of farmland, and petitioner's contention that County failed to require mitigation is without merit.

Petitioner next argues that the EIR fails to evaluate feasible mitigation measures. We disagree. "If more than one mitigation measure is available, the EIR must discuss each and describe reasons for the measure or

measures it selects." (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 724 [58 Cal.Rptr.3d 102], citing Guidelines, § 15126.4, subd. (a)(1)(B).) Here, County considered ACEs as a possible mitigation measure along with the three mitigation measures recommended in the DEIR. In Collective Response 6, the FEIR discusses ACEs, comparing them to the recommended mitigation measures of continuing agricultural production until each cell is ready to be mined, saving the topsoil and overburden to reclaim some of the mined land to farmland, and requiring a 600-acre agricultural zone within the Project site. The FEIR notes that mitigation measure AG-2 preserves farmland at a 1:1 ratio for the life of the Project, which is 100 years. Accordingly, we reject petitioner's contention that the EIR fails to evaluate feasible mitigation measures.[22]

Petitioner also appears to take the position that County was required to adopt the use of ACEs as a mitigation measure as a matter of law. Petitioner asserts, "[F]ailure to require compensatory mitigation is a violation of the law."

Petitioner relies on *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 238 [159 Cal.Rptr.3d 860] (*Masonite*), in which the Court of Appeal held, ". . . ACEs may appropriately mitigate the direct loss of farmland when a project converts agricultural land to a nonagricultural use . . . ." This case does not support petitioner's position.

In *Masonite*, Mendocino County approved a project for a sand and gravel quarry on a site where vineyards were cultivated. (*Masonite, supra*, 218 Cal.App.4th at p. 233.) The EIR for the project rejected the use of ACEs as a

---

[22] We recognize that the DEIR states there is a "lack of feasible mitigation" for the conversion of farmland. The DEIR, however, goes on to recommend three mitigation measures that are intended to lessen the Project's impact on farmland. Thus, we do not read the DEIR as concluding there are no measures that would minimize or compensate for the impact (mitigation), which are capable of being accomplished in a successful manner (feasible). Rather, in context, it is apparent that the DEIR means no feasible measures are available that would mitigate the impact to a less-than-significant level. This is a common use of the phrase "feasible mitigation."

For example, in *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296 [140 Cal.Rptr.3d 459] (*Lodi*), a case involving a proposal to build a shopping center on farmland, the lead agency found there were "no feasible mitigation measures" because no mitigation could avoid the significant impact resulting from the permanent loss of farmland. (*Id.* at pp. 301, 323.) The lead agency went on to require the project applicant to acquire an ACE. (*Id.* at p. 322.) The Court of Appeal found substantial evidence to support the lead agency's finding that "there were no feasible mitigation measures," although the court also noted that the ACE requirement "would minimize and substantially lessen the significant effects" of the project. (*Id.* at p. 324.) Since the *Lodi* court expressly recognized that the ACE requirement would mitigate a significant impact, it is clear the court intended the phrase "there were no feasible mitigation measures" to mean there were no feasible mitigation measures that would reduce the project's impact to a level of insignificance. (*Ibid.*)

possible mitigation measure. The EIR explained the county's understanding that an ACE only mitigates " 'the indirect and cumulative effects of farmland conversion,' " such as " 'pressure created to encourage additional conversions' " of nearby farmland, but an ACE does not mitigate the direct loss of farmland because it " 'does not replace the on-site resources' " of prime farmland. (*Masonite, supra*, at p. 236.) The EIR went on to conclude that the project would not create indirect development pressure on agricultural lands and, as a result, " 'feasible mitigation measures are not available . . . .' " (*Masonite, supra*, at p. 236.) The planning commission adopted a statement of overriding considerations. (*Id.* at p. 234.)

The Court of Appeal disagreed with the EIR's discussion of ACEs. The court explained: "The County presumed that ACEs were useful only to address 'the indirect and cumulative effects of farmland conversion,' and were not needed here because the Project would have no such effects. Thus, the finding of infeasibility in the EIR rested on the legal conclusion that while ACEs can be used to mitigate a project's indirect and cumulative effects on agricultural resources, they do not mitigate its direct effect on those resources." (*Masonite, supra*, 218 Cal.App.4th at p. 238.) The court rejected the county's presumption and legal conclusion, holding: "We conclude that ACEs may appropriately mitigate the direct loss of farmland when a project converts agricultural land to a nonagricultural use, even though an ACE does not replace the onsite resources. Our conclusion is reinforced by the CEQA Guidelines, case law on offsite mitigation for loss of biological resources, case law on ACEs, prevailing practice, and the public policy of this state." (*Ibid.*)

The court reasoned that ACEs "compensate" for the loss of farmland within the Guidelines' definition of mitigation. (*Masonite, supra*, 218 Cal.App.4th at p. 238, citing Guidelines, § 15370, subd. (e).) It noted that case law has recognized offsite preservation of habitats for endangered species as an accepted means of mitigating impacts on biological resources, and that ACEs serve a similar function. (*Masonite, supra*, at pp. 238–239 [citing cases on use of conservation of offsite habitat as mitigation].) Considering case law on ACEs, the *Masonite* court cited *Lodi, supra*, 205 Cal.App.4th 296. (*Masonite, supra*, at p. 239.) In *Lodi*, the court observed that requiring the project applicant to acquire an offsite ACE "would minimize and substantially lessen the significant effects of the proposed project." (*Lodi, supra*, at p. 324.) The *Masonite* court further explained that ACEs "are commonly used" to mitigate the loss of farmland. (*Masonite, supra*, at p. 240.) Finally, the court relied on the Legislature's repeated declarations that "the preservation of agricultural land is an important public policy." (*Id.* at pp. 240–241 [citing statutes].)

The court concluded: "To categorically exclude ACEs as a means to mitigate the conversion of farmland would be contrary to one of CEQA's important purposes. . . . ACEs should not 'be removed from agencies' toolboxes as available mitigation' for this environmental impact." (*Masonite, supra*, 218 Cal.App.4th at p. 241.) Therefore, the court required Mendocino County to "explore[]" the economic feasibility of offsite ACES to mitigate the project's impact on the loss of 45 acres of prime farmland. (*Ibid.*)

■ In sum, the *Masonite* court held that ACEs may mitigate the direct loss of farmland and that the lead agency in that case erred by failing to consider ACEs as a potential mitigation measure for this direct loss. We do not read *Masonite*, however, to stand for the proposition that CEQA *requires* the use of ACEs as a mitigation measure in every case where ACEs are economically feasible and the project causes the loss of farmland. In *Masonite*, the lead agency did not believe ACEs were applicable and apparently did not adopt any mitigation measures to address the loss of farmland caused by the project. Here, in contrast, County did not "categorically exclude ACEs as a means to mitigate the conversion of farmland." (*Masonite, supra*, 218 Cal.App.4th at p. 241.) Rather, County considered the use of ACEs along with other mitigation measures and selected the three mitigation measures recommended in the DEIR. We decline to hold that County was required to adopt ACEs as a mitigation measure instead of the mitigation measures it did adopt.

■ Finally, we reject petitioner's argument that County failed to provide a reasoned response to commenters raising concerns regarding the conversion of agricultural lands to other uses. "An agency must evaluate and respond to timely comments on the draft EIR that raise significant environmental issues. [Citations.] Responses must describe the disposition of the issues raised in the comments. [Citations.] If the agency rejects a recommendation or objection concerning a significant environmental issue, the response must explain the reasons why. [Citation.]" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 475 [134 Cal.Rptr.3d 194].) Other than arguing County should have required the acquisition of ACEs as a mitigation measure, petitioner does not explain how Collective Response 6 is deficient. We do not find the response to be inadequate.

F.–I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 105.

V.  *Findings required to approve CUP**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## *DISPOSITION*

The judgment is affirmed. Costs on appeal are awarded to respondents and real parties in interest.

Gomes, Acting P. J., and Franson, J., concurred.

---

*See footnote, *ante*, page 105.